Anthony J. Ellrod (State Bar No. 136574)
 *tony.ellrod@manningkass.com*
Linna Loangkote (State Bar No. 287480)
 *linna.loangkote@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendant MICHAEL
MILCH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VOGUE RECOVERY CALIFORNIA LLC, a California limited liability company; VOGUE RECOVERY ARIZONA LLC, an Arizona limited liability company; and VOGUE RECOVERY CENTER LLC, a Nevada limited liability company, | Case No. 2:22-cv-06751-KK-AFM **NOTICE OF MOTION AND MOTION OF DEFENDANT MICHAEL MILCH FOR RENEWED JUDGMENT AS A MATTER OF LAW; MEMORANDUM OF POINTS AND AUTHORITIES** |
| Plaintiffs, | |
| v. | |
| CMJ RECOVERY CA LLC, a California limited liability company; CMJ RECOVERY AZ LLC, an Arizona limited liability company; CMJ RECOVERY NV LLC, a Nevada limited liability company; SHAUL KOPELOWITZ, an individual; MICHAEL MILCH, an individual; JOEL STRULOVICS, an individual; and YISROEL HERZKA, an individual, | |
| Defendants. | |

**Hearing Date:**
**Time:**          **9:30 a.m.**
**Courtroom:**   **3**

Action Filed:   September 20, 2022
Trial Date:     April 2, 2024

/ / /

/ / /

/ / /

/ / /

4872-8296-5186.2

**DEFENDANT MICHAEL MILCH'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

   **PLEASE TAKE NOTICE THAT on _____ at 9:30 a.m.** or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Kenly Kiya Kato, located in the George E. Brown, Jr., United States Courthouse, 3470 12th Street, 3rd Floor, Riverside California, Defendant Michael Milch (Milch) will and hereby does renew his motion for judgment as a matter of law.

   This motion is made pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, on the grounds that:

   1.   Plaintiffs' cause of action for intentional interference with contract is legally deficient because, as an agent of the entity defendants, Milch cannot be liable in tort for interfering with those defendants' contracts;

   2.   Plaintiffs failed to provide sufficient evidence that Milch engaged in any intentional conduct designed to interfere with a contract;

   3.   Plaintiffs did not produce sufficient evidence of Milch's net worth or financial condition, such that an award of punitive damages was legally justified; and,

   4.   Plaintiffs failed to demonstrate by clear and convincing evidence that Milch engaged in conduct warranting an award of punitive damages.

   This motion is based on this notice, the attached memorandum of points and authorities, the declaration filed concurrently herewith, all of the pleadings, files, and records in this proceeding, all other matters of which the court may take judicial notice, and any argument or evidence that may be presented to or considered by the court prior to its ruling.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

MK MANNING | KASS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STATEMENT OF COMPLIANCE WITH LOCAL RULE 7-3

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on June 6, 2024. The parties were unable to reach a resolution that eliminates the necessity for a hearing.

DATED:  June 20, 2024                    Respectfully submitted,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By: _____/s/ Anthony J. Ellrod_____
        Anthony J. Ellrod
        Linna Loangkote
        Attorneys for Defendant MICHAEL
        MILCH

MANNING | KASS

1

# **TABLE OF CONTENTS**

STATEMENT OF COMPLIANCE WITH LOCAL RULE 7-3 .................................3

TABLE OF CONTENTS ...............................................................................1

TABLE OF AUTHORITIES .........................................................................2

MEMORANDUM OF POINTS AND AUTHORITIES.....................................3

I.     INTRODUCTION ...........................................................................3

II.    BACKGROUND .............................................................................3

   A. Plaintiffs' Allegations ...............................................................3

   B. Evidence Presented at Trial .......................................................4

   C. The Individual Defendants' Prior Motions ...................................7

   D. Verdict and Judgment................................................................7

III.   LEGAL STANDARD .......................................................................8

IV.    ANALYSIS .....................................................................................9

   A. Milch Cannot be Liable as a Matter of Law for Interfering with the CMJ
Entities' Contracts ...........................................................................9

   B. The Trial Evidence Does Not Show Any Evidence of Intentional Interference
by Milch .......................................................................................12

   C. Plaintiffs Produced No Evidence of Milch's Financial Condition .................13

   D. Plaintiffs Did Not Meet Their Burden of Proving Conduct Warranting
Punitive Damages ...........................................................................14

V.   CONCLUSION ................................................................................16

CERTIFICATE OF WORD COUNT...............................................................17

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MANNING | KASS

MK

# TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 8
*Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236 (9th Cir. 2014)........................ 8
*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ......................... 8

**State Cases**

*Adams v. Murakami*, 54 Cal.3d 105 (1991)................................................................ 13
*Applied Equipment Corp. v. Litton Saudi Arabia Ltd*., 7 Cal.4th 503 (1994)............. 9
*Auto Equity Sales, Inc. v. Superior Court*, 57 Cal.2d 450 (1962) ............................. 11
*Bankhead v. ArvinMentor, Inc.*, 205 Cal.App.4th 68 (2012) .................................... 13
*Caliber Paving Co., Inc. v. Rexford Industrial Realty & Mgmt., Inc.*, 54 Cal.App.5th
   175 (2020)........................................................................................................ 10, 12
*College Hospital, Inc. v. Superior Court*, 8 Cal.4th 704 (1994) ............................... 15
*Farmers & Merchants Trust Co. v. Vanetik*, 33 Cal.App.5th 638 (2019)................. 14
*G.D. Searle & Co. v. Superior Court of Sacramento County*, 49 Cal.App.3d 22
   (1975)................................................................................................................... 15
*Jenkins v. Inglewood Unified Sch. Dist.*, 34 Cal.App.4th 1388 (1995)..................... 10
*Mintz v. Blue Cross of Cal.*, 172 Cal.App.4th 1594 (2009) ................................ 10, 11
*Neal v. Farmers Ins. Exchange*, 21 Cal.3d 910 (1978) ............................................ 14
*Nolin v. National Convenience Stores, Inc*., 95 Cal.App.3d 279 (1979) ................... 15
*PM Group, Inc. v. Stewart*, 154 Cal.App.4th 55 (2007) ....................................... 9, 11
*Reeves v. Hanlon*, 33 Cal.4th 1140 (2004)............................................................. 9, 13
*Robert L. Cloud & Associates, Inc. v. Mikesell*, 69 Cal.App.4th 1152 (1999) ......... 14
*Shoemaker v. Myers*, 52 Cal.3d 1 (1990) ................................................................... 9
*Storage Svcs. v. C.R. Oosterbaan*, 214 Cal.App.3d 498 (1989)............................... 14
*Woods v. Fox Broadcasting Sub., Inc.,* 129 Cal.App.4th 344 (2005) ................. 10, 11

**State Statutes**

Cal. Civ. Code § 3294............................................................................................... 15

**Rules**

Fed. R. Civ. P. 50....................................................................................................... 8

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3    This renewed motion for a judgment as a matter of law follows the Court's
4    denial of pretrial and pre-judgment motions for judgment as a matter of law.
5    Defendant Michael Milch (Milch) renews the following claims: (1) Plaintiffs' cause
6    of action for intentional interference with contract is legally deficient because, as an
7    officer and agent of the entity defendants, Milch cannot be liable in tort for interfering
8    with those defendants' contracts; (2) Plaintiffs did not produce sufficient evidence of
9    intentional conduct on the part of Milch designed to induce a breach; (3) Plaintiffs did
10    not produce any evidence of Milch's net worth or financial condition, such that an
11    award of punitive damages was legally justified; and (4) Plaintiffs did not produce
12    clear and convincing evidence of conduct warranting the imposition of punitive
13    damages.

14

**II.    BACKGROUND**

15

      **A.    Plaintiffs' Allegations**

16    In July 2020, Plaintiffs and Defendants executed an Asset Purchase Agreement
17    (APA) providing for Plaintiffs' sale of the assets of substance use disorder treatment
18    and sober living facilities in California, Nevada, and Arizona to CMJ Recovery CA
19    LLC, CMJ Recovery NV LLC, and CMJ Recovery AZ LLC (collectively, the "CMJ
20    Entities"). The APA provided that if the collected revenue of all facilities exceeded
21    $80 million for the two years following the closing date of the transaction, or the date
22    the CMJ Entities commenced operating the facilities (whichever was later), the CMJ
23    Entities were to pay Plaintiffs an additional $10 million "earn-out." ECF No. 1 at ¶ 17.
24    Plaintiffs alleged the CMJ Entities satisfied the conditions of the APA and therefore
25    they were entitled to the $10 million earn-out. *Id*. at ¶ 33. Plaintiffs sued the CMJ
26    Entities for breach of contract and breach of the implied covenant of good faith and
27    fair dealing under Arizona law, and sued the individual defendants (including Milch)
28    for intentional interference with contract under California law.

**B.    Evidence Presented at Trial**

Milch, along with Defendants Joel Strulovics and Yisroel Herzka, were part of the ownership group that acquired the Vogue treatment facilities in July 2020. 3 RT 292-293.[1] Milch was the first of the individual defendants to approach George Boyadzhyan, the former CEO of Vogue, about acquiring the company. 4 RT 423. One of the reasons Milch was interested in acquiring the Vogue facilities was that he saw a program with "a ton of growth potential." *Id*.

Following the acquisition, Milch became CEO of the former Vogue company. 4 RT 427. The same ownership group acquired Footprints to Recovery in December 2020, South Coast Behavioral Health in March 2021, and Royal Life Centers in December 2021. 4 RT 428-429. Footprints to Recovery operates facilities in Colorado, New Jersey, and Illinois; South Coast operates a facility in Orange County, California; and Royal Life Centers operates facilities in Washington State and Arizona. 4 RT 373. At some point during the earn-out period, the companies were operated as the Aliya Health Group of Companies (Aliya), of which Milch acted as CEO. 4 RT 429-430. During the earn-out period, Boyadzhyan approached Herzka about purchasing a facility owned by Boyadzhyan's brother-in-law "right next to" a CMJ facility in Arizona, but CMJ did not purchase it. 4 RT 420-421.

In early 2021, Milch realized revenue was not coming in because authorizations had not been obtained for many patients, and because claims were being submitted with incorrect information. 5 RT 458-459. Milch testified that he "never considered for even a second" that the company was close to meeting the $80 million required to trigger the earn-out provision. 5 RT 465-466.

Milch confirmed that he was not involved in the assignment of patients to

---

[1]    "RT" refers to the reporter's transcript of trial proceedings, cited by volume and page number. Relevant portions of the transcript are attached as exhibits to the concurrently filed Declaration of Anthony J. Ellrod.

DEFENDANT MICHAEL MILCH'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

particular facilities. 5 RT 485. Milch testified that he was not aware of any patient being diverted from a Vogue facility to another facility, he never diverted a patient from a Vogue facility to another facility, he never instructed staff to divert a patient from a Vogue facility to another facility, and never saw any documents that discussed diverting patients from a Vogue facility to another facility. 5 RT 485-486. Milch was not asked, and did not testify, regarding his financial condition or net worth, nor were any documents or other evidence relevant to Milch's financial condition admitted into evidence.

Strulovics, one of the other members of the CMJ acquisition group, was shown census data for the Vogue/CMJ facilities and agreed the data showed a drop in patient days in Nevada following the acquisition of Footprints to Recovery and a drop in patient days in California following the acquisition of South Coast. 3 RT 332-334. Strulovics was not asked why the census count dropped or if he had anything to do with the drop in the census count.

Strulovics explained that the clientele at the Vogue California facility was different from the clientele at the South Coast facility because South Coast had only in-network benefits, while Vogue had only out-of-network benefits; as a result, there was nothing to gain by asking clients to go from one facility to another. 3 RT 335-336. Strulovics also explained that the admissions department, not the owners, determined which facilities patients should go to based on what was best for the patients. 3 RT 336. Strulovics testified that Aliya was already involved in assisted living and as it grew, it sought to enter the behavioral health space. 4 RT 374. Strulovics testified that Aliya did not acquire other rehabilitation facilities in order to specifically hurt the Vogue assets that were purchased. To the contrary, Strulovics explained that Aliya paid more for the Vogue facilities than the earn-out, so it would not make financial sense to shift clients from one facility to another. *Id*. Strulovics denied taking any actions intended to prevent the facilities from reaching the earn-out threshold. 4 RT 375-376. Similarly, Herzka denied doing anything to avoid having to

1    pay the earn-out. 4 RT 421.

2        From April 2020 through June 2022, Tina Gonzales was the executive director

3    of the Vogue California facility in Tarzana. 5 RT 509-510. Gonzales testified that she

4    became concerned about a drop in the patient census at that facility and raised her

5    concerns with Jay Miller, the director of admissions. 5 RT 512-514. Miller explained

6    that the drop was due to insurance policies not matching what was needed at the

7    Tarzana facility. 5 RT 514. Gonzales was not asked, and did not testify, that the drop

8    in the census was due to any acts by Milch or the other individual defendants designed

9    to funnel patients to other facilities. To the contrary, Gonzales testified she had no

10   information suggesting Milch was redirecting patients to other facilities. 5 RT 519.

11       Jay Miller was vice president of admissions for Aliya Health Group from April

12   2021 through July 2022. 5 RT 493-494. Miller reported to Milch during that period.

13   5 RT 494. One of Miller's duties was to handle referrals to the Vogue/CMJ facilities

14   from the Department of Veterans Affairs. *Id*. Miller confirmed that Gonzales called

15   him to express concern about the decrease in the patient census at the Tarzana facility

16   and confirmed there was a one- or two-patient decrease in the count at the Tarzana

17   facility following the acquisition of South Coast rehabilitation facilities. 5 RT 496-

18   497.

19       Miller testified that a drop in the patient census was normal because the Tarzana

20   facility had only six beds and was considered a "luxury facility." As a result, Miller

21   had to be "selective" about patients because some insurance policies might not pay

22   for the facility. 5 RT 502. Miller was not asked, and did not testify, that the drop in

23   the census was due to any acts by Milch or the other individual defendants designed

24   to funnel patients to other facilities. To the contrary, Miller testified that no one ever

25   told him not to send patients to Vogue Recovery. 5 RT 503. He further testified that

26   he never saw any document, letter, email, or text discussing diverting patients from

27   Vogue Recovery. 5 RT 506.

28

MANNING | KASS

### C. The Individual Defendants' Prior Motions

The individual defendants (which included Milch) filed a motion for judgment as a matter of law on March 29, 2024. ECF No. 113. On April 4, 2024, Defendants made an oral motion for judgment as a matter of law following the close of Plaintiffs' case-in-chief. ECF No. 124 at 2; 6 RT 683. Defendants argued that Plaintiffs failed to meet their burden of demonstrating malice, oppression, or fraud in order to justify punitive damages; that the individual defendants could not be liable for tortious interference with contract; that Plaintiffs failed to establish breach of contract; and that Plaintiff failed to establish breach of the covenant of good faith and fair dealing. 6 RT 683-686.

On April 5, 2024, the Court denied the oral motion in part and granted it in part. As relevant here, the Court denied the individual defendants' motion, which was brought on the ground that they were not strangers to the contract. *Id*.

After all parties rested on April 5, 2024, counsel for Milch objected to the question of punitive damages going to the jury because absolutely no evidence of Milch's financial condition had been admitted, and moved to strike the punitive damages claim on that basis. The court denied the motion and the case went to the jury on punitive damages. 7 RT 785-788.

### D. Verdict and Judgment

With respect to punitive damages, the jury was instructed: "There is no fixed formula for determining the amount of punitive damages, and you are not required to award any punitive damages. If you decide to award punitive damages, you should consider all of the following factors in determining the amount: [¶] … [¶] C. In view of Michael Milch, Joel Strulovics, and/or Yisroel Herzka's financial condition, what amount is necessary to punish them and discourage future wrongful conduct?" 7 RT 807-808.

During deliberations, the jury sent the Court a note, which read, "If we decide punitive damages are to be awarded, how would we determine an amount for each

7

DEFENDANT MICHAEL MILCH'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

1  defendant?" ECF No. 130; 8 RT 875-876. The Court, with no objection from the
2  parties, responded: "The jury instructions, including jury Instruction No. 29, which
3  were previously read to you, provide the law you are to apply in determining punitive
4  damages." 8 RT 877-878.

5      On April 8, 2024, the jury entered verdicts against the CMJ entities and
6  individual defendants as to all causes of action. The jury additionally awarded
7  Plaintiffs punitive damages and prejudgment interest. *See* ECF No. 140. On May 22,
8  2024, the Court entered judgment in favor of Plaintiffs, and against Defendants in the
9  amount of $10 million, plus prejudgment interest. ECF No. 159 at 1. As to Milch, the
10 Court awarded punitive damages in the amount of $750,000. *Id*. at 2.

11 **III.    LEGAL STANDARD**

12     Rule 50(b) of the Federal Rules of Civil Procedure provides that if the Court
13 denies a motion for judgment as a matter of law (JMOL) under Rule 50(a), the moving
14 party may file a renewed motion for judgment as a matter of law. A court should grant
15 a motion for judgment as a matter of law if, under governing law, there can be only
16 one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
17 242, 250 (1986). "A renewed motion for JMOL is properly granted 'if the evidence,
18 construed in the light most favorable to the nonmoving party, permits only one
19 reasonable conclusion, and that conclusion is contrary to the jury's verdict.' " *Escriba*
20 *v. Foster Poultry Farms, Inc.*, 743 F.3d 1236 (9th Cir. 2014). "Reviewing a renewed
21 motion for JMOL requires scrutiny of the entire evidentiary record, but the court
22 'must not weigh the evidence, [and instead] should simply ask whether the
23 [nonmoving party] has presented sufficient evidence to support the jury's
24 conclusion.' " *Id*. at 1242; *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530
25 U.S. 133, 149-151 (2000) (holding that the court reviews the entire record, not just
26 the evidence favorable to the nonmoving party). "The mere existence of a scintilla of
27 evidence in support of the plaintiff's position will be insufficient; there must be
28 evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477

MANNING | KASS

4872-8296-5186.2

8

U.S. at 252.

## IV.   ANALYSIS

### A.   Milch Cannot be Liable as a Matter of Law for Interfering with the CMJ Entities' Contracts

Under California law, "[t]o prevail on a cause of action for intentional interference with contractual relations, a plaintiff must plead and prove (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Reeves v. Hanlon*, 33 Cal.4th 1140, 1148 (2004).

"[C]onsistent with its underlying policy of protecting the expectations of contracting parties against frustration by outsiders who have no legitimate social or economic interest in the contractual relationship, the tort cause of action for interference with contract does not lie against a party to the contract." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 514 (1994). Thus, "[t]he tort of intentional interference with contractual relations is committed only by 'strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance.' " *PM Group, Inc. v. Stewart*, 154 Cal.App.4th 55, 65 (2007).

Here, Milch was not a "stranger," an "interloper," or someone who had "no legitimate interest in the scope or course" of the APA. Quite to the contrary, Milch was part of the ownership group that purchased the treatment facilities from Plaintiffs. 4 RT 422-423. Following the acquisition, Milch was made CEO of the CMJ Entities. 4 RT 427.[2] It is well established that "corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract." *Shoemaker v. Myers*, 52 Cal.3d 1, 24 (1990). This is because

---

[2]   Indeed, Milch testified that he was the "M" in "CMJ." 5 RT 470.

a corporation's agents "stand in the place of" the corporation, which "cannot act except through such agents." *Id.* at 25; *see also Mintz v. Blue Cross of Cal.*, 172 Cal.App.4th 1594, 1603-1604 (2009) (holding that Blue Cross, as an agent of CalPERS, could not be liable for interfering with the contract between the insured and CalPERS); *Jenkins v. Inglewood Unified Sch. Dist.*, 34 Cal.App.4th 1388, 1395 (1995) (sustaining school board members' demurrer to intentional interference with school district's contract with the plaintiff, as they were agents or employees of the school district).

The record is bereft of *any* evidence, let alone a "scintilla" of evidence, that Milch was acting in any capacity other than as CEO of the CMJ Entities when any purported interference occurred. The record is clear that at all relevant times, Milch was an agent and employee of the CMJ Entities, and consequently, cannot be liable as a matter of law for intentional interference with the APA, a contract to which the CMJ Entities—of which Milch was not only an agent, but the CEO—are a party.

In denying the original JMOL motion, the Court cited two cases, *Woods v. Fox Broadcasting Sub., Inc.,* 129 Cal.App.4th 344 (2005) and *Caliber Paving Co., Inc. v. Rexford Industrial Realty & Mgmt., Inc.*, 54 Cal.App.5th 175 (2020) for the proposition that California courts have allowed claims against offers, directors, and owners of companies who contracts were the subjects of the litigation. ECF No. 124 at 3. Both cases, however, are distinguishable from the facts adduced during this trial.

In *Woods*, the plaintiffs were executives of Fox Family and its joint venture partner, Saban Entertainment. Fox Family was owned half by various Fox Entertainment entities (collectively, "Fox") and half by Haim Saban. Saban later sold his interest to Fox, and Fox in turn sold the entire interest to Disney. The plaintiffs, who were guaranteed stock options if Saban sold his interest, alleged the deal was engineered such that they were deprived of $4 million each in stock options. The plaintiffs sued Fox for, *inter alia*, intentional interference with contract, and Fox demurred on the basis that it was not a stranger to the agreements with the plaintiffs

1  and therefore could not interfere with a contract to which it was a party. *Woods*, 129

2  Cal.App.4th at 347–348.

3      The Court of Appeal in *Woods* held it was "highly unlikely" that *Applied*

4  *Equipment*, 7 Cal.4th 503, "intended to hold, or should be construed as holding, that

5  persons or entities with an ownership interest in a corporation are automatically

6  immune from liability for interfering with their corporation's contractual obligations."

7  *Woods*, 129 Cal.App.4th at 353. Of course, *Woods*, as a decision of the California

8  Court of Appeal, could not abrogate *Applied Equipment*, a decision of the California

9  Supreme Court. *See Auto Equity Sales, Inc. v. Superior Court*, 57 Cal.2d 450, 455

10 (1962). What *Woods* did do is suggest *Applied Equipment* could not be "stretched so

11 far that it now protects a defendant who has no more than an economic interest or

12 connection to the plaintiff's contract with some other entity." *Woods*, 129 Cal.App.4th

13 at 355. Fox was not an officer, director, or agent of Fox Family, but a shareholder. "In

14 short, *Woods* merely concludes that a shareholder is not automatically immune from

15 liability for interfering with the contractual obligations of the company in which it

16 holds shares; *Woods* does not stand for the proposition that the agent of a contracting

17 party may be liable for interference with its principal's contract." *Mintz*, 172

18 Cal.App.4th at 1604, n. 3 (internal citation omitted). Milch, unlike Fox, was not

19 merely a shareholder in the CMJ Entities; he was their CEO. Furthermore, unlike Fox,

20 which was simply a shareholder, all the actions by Milch which purportedly

21 "interfered" were done in the course and scope of Milch's employment with the CMJ

22 Entities. As such, it cannot be argued that Milch had "no legitimate interest in the

23 scope or course of the contract's performance." *PM Group, Inc.*, 154 Cal.App.4th at

24 65.

25      *Caliber Paving* is also distinguishable. In that case, the plaintiff (Caliber) sued

26 the defendant (Rexford) for intentionally interfering with a contract between Caliber

27 and a third party, Steve Fodor Construction (SFC). Rexford owned and operated

28 industrial properties and hired SFC to repave the parking lot of one of its properties.

4872-8296-5186.2

11

MANNING | KASS

SFC hired Caliber to perform the actual repaving. A dispute arose at the start of work because trucks and trailers were parked on the job site and Caliber began charging SFC for the delay. SFC refused to pay and ended up hiring another subcontractor to pave the parking lot. Caliber sued SFC for breach of contract and sued Rexford for intentional interference, on the theory that Rexford intentionally prevented Caliber from starting work because "Rexford wanted Caliber off the job." *Caliber Paving*, 54 Cal.App.5th at 178–179.

Rexford moved for summary judgment on the basis that it was not a stranger to the contract, which the trial court granted, reasoning that because Rexford owned the property, it had an "economic interest" in the contractual relationship (even though Rexford was not a party to the Caliber/SFC contract and even though Rexford had no affiliation with either Caliber or SFC other than as the entity which hired SFC). The Court of Appeal in *Caliber Paving* reversed, declining to extend *Applied Equipment* to a situation in which a non-contracting party's only "interest" in the contract is a social or economic one. *Caliber Paving*, 54 Cal.App.5th at 182–183. *Caliber Paving* could not, and does not, opine on whether an officer, director, or manager of a corporation, acting in the course and scope of his employment, can be liable in tort for interfering with the corporations' contracts because that was simply not an issue in that case. Here, as noted, Milch was not simply an outsider with an attenuated economic interest in the contract between Plaintiffs and the CMJ Entities and not simply, as in *Caliber Paving*, the hirer of an outside vendor. He was the CEO of the CMJ Entities. Under *Applied Equipment* and *Mintz*, as a legally recognized agent of the CMJ Entities, empowered to make decisions on their behalf (as opposed to a shareholder or the hirer of a contractor), Milch cannot be liable as a matter of law for intentionally interfering with contracts to which the CMJ Entities were a party.

## B.   The Trial Evidence Does Not Show Any Evidence of Intentional Interference by Milch

Plaintiffs additionally failed to provide substantial evidence of any interference

12

by Milch in the contracts between Plaintiffs and the CMJ Entities. *Reeves*, 33 Cal.4th at 1148. Plaintiffs' theory of the case was that the defendants, including Milch, diverted patients from CMJ facilities to other facilities in order to depress revenue and avoid triggering the $10 million earn-out provision. 2 RT 108. However, neither Gonzales, nor Miller, nor Strulovics, nor Herzka, nor Milch himself testified that any patients were being diverted to other facilities or that any action had been taken to depress revenue or avoid paying the earn-out. 4 RT 375-376, 421; 5 RT 485-486, 503, 519. Consequently, Plaintiffs failed to meet their burden of producing *any* evidence, let alone substantial evidence, of any acts undertaken by Milch to interfere with the APA.

### C.    Plaintiffs Produced No Evidence of Milch's Financial Condition

A plaintiff seeking punitive damages bears the burden of proving the defendant's financial condition. *Adams v. Murakami*, 54 Cal.3d 105, 119-120 (1991). "It is not too much to ask of a plaintiff seeking such a windfall to require that he or she introduce evidence that will allow a jury and a reviewing court to determine whether the amount of the award is appropriate and, in particular, whether it is excessive in light of the central goal of deterrence." *Id*. at 120.

"Under California law, '[w]ealth is an important consideration in determining the excessiveness of a punitive damage award. Because the purposes of punitive damages are to punish the wrongdoer and to make an example of him, the wealthier the wrongdoer, the larger the award of punitive damages.' " *Bankhead v. ArvinMentor, Inc.*, 205 Cal.App.4th 68, 77 (2012) (citations omitted). "Calculation of punitive damages 'involves … "a fluid process of adding or subtracting depending on the nature of the acts and the effect on the parties and the worth of the defendants." ' " *Id*. at 78.

Net worth is considered the hallmark of determining the defendant's financial condition, and thus whether the amount of punitive damages appropriate or is excessive and disproportionate. *Storage Svcs. v. C.R. Oosterbaan*, 214 Cal.App.3d

498, 514-515 (1989). "[T]he function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." *Neal v. Farmers Ins. Exchange*, 21 Cal.3d 910, 928 (1978).

Here, the only evidence adduced at trial was that individual defendants, collectively, earned income from the companies. 7 RT 786. No evidence was presented of their individual financial conditions, and no evidence was presented of their individual net worth. But whether the individual defendants *collectively* earned income from the companies has no bearing on either their net worth or their financial condition. Evidence of income, alone, is not sufficient to prove a defendant's financial condition. *See Farmers & Merchants Trust Co. v. Vanetik*, 33 Cal.App.5th 638, 647-648 (2019) ("We may not infer sufficient wealth to pay a punitive damages award from a narrow set of data points, such as ownership of valuable asses or a substantial annual income"); *Robert L. Cloud & Associates, Inc. v. Mikesell*, 69 Cal.App.4th 1141, 1152 (1999) (neither evidence of a defendant's annual income, nor evidence of wrongfully gained profits, standing alone, is adequate, as such information "gives only the assets without the liabilities"). Because *no* evidence of Milch's financial condition or net worth, or even his liabilities, was presented to the jury, the jury's award of $750,000 in punitive damages as against Milch was impermissible as a matter of law.

Where, as here, a plaintiff has had a full and fair opportunity to present its case on the issue of punitive damages, a new trial is not available. *Farmers & Merchants Trust Co.*, 33 Cal.App.5th at 650. Judgment as a matter of law should be entered in favor of Milch on the issue of punitive damages.

## D.     Plaintiffs Did Not Meet Their Burden of Proving Conduct Warranting Punitive Damages

In order to be awarded punitive damages, a plaintiff must prove by "clear and convincing evidence" that the defendant "has been guilty of oppression, fraud, or

malice." Cal. Civ. Code § 3294(a). To prove malice, a plaintiff must show that the defendant's conduct was intended to injure the plaintiff or was "despicable" and "carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1). It is not enough to allege that the defendant acted with a willful and conscious disregard; a plaintiff must show that a defendant's conduct was "despicable." *College Hospital, Inc. v. Superior Court*, 8 Cal.4th 704, 725 (1994). Conduct that may be characterized as unreasonable, negligent, grossly negligent, or reckless does not satisfy the "highly culpable" state of mind required for punitive damages. *G.D. Searle & Co. v. Superior Court of Sacramento County*, 49 Cal.App.3d 22, 31 (1975)

As noted previously, Plaintiffs did not proffer *any* evidence, let alone clear and convincing evidence, that Milch intentionally diverted patients from CMJ facilities in order to avoid triggering the earn-out. In fact, the trial testimony demonstrated Milch *did not* do so. 4 RT 375-376; 5 RT 485-486, 503, 519. In closing, Plaintiffs argued for the first time that punitive damages were somehow warranted because the individual defendants ignored billing and collections problems (7 RT 815-817) and because they concealed their supposed intention not to pay the earn-out (7 RT 863). The second ground for punitive damages was not supported by any evidence. The first, even if true, could not constitute a basis for punitive damages because "conduct classified only as unintentional carelessness, while it may constitute negligence or even gross negligence, will not support an award of punitive damages." *Nolin v. National Convenience Stores, Inc*., 95 Cal.App.3d 279, 286 (1979); *see also G.D. Searle & Co.*, 49 Cal.App.3d at 31. Plaintiffs' failure to meet their burden of proving malice, oppression, or fraud on the part of Milch by clear and convincing evidence provides an independent reason to enter judgment as a matter of law in favor of Milch on the issue of punitive damages.

1   **V.     CONCLUSION**

2          For the foregoing reasons, Milch respectfully requests that the Court grant the

3   instant renewed motion for judgment as a matter of law.

4

5   DATED:  June 20, 2024           Respectfully submitted,

6                                   **MANNING & KASS**
7                                   **ELLROD, RAMIREZ, TRESTER LLP**

8                                   By:      /s/ Anthony J. Ellrod
9                                         Anthony J. Ellrod
10                                        Linna Loangkote
                                          Attorneys for Defendant MICHAEL
11                                        MILCH

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF WORD COUNT</u>

The undersigned counsel of record for Defendant Michael Milch certifies that this brief contains 4,480 words (excluding the caption, table of contents, table of authorities, signature block, this certificate, and any indices or exhibits), which complies with the word limit of Local Rule 11-6.1.

DATED:  June 20, 2024                    Respectfully submitted,

**MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP**

By:    _____/s/ Anthony J. Ellrod_____
          Anthony J. Ellrod
          Linna Loangkote
          Attorneys for Defendant MICHAEL
          MILCH

**DEFENDANT MICHAEL MILCH'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**